IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN T. WALKER,<br>　　　　Plaintiff,<br><br>　　v.<br><br>PAMELA SELLERS AND SERGEANT<br>JOHN PETERS III,<br>　　　　Defendants. | CIVIL ACTION<br><br><br><br>NO.   21-660 |

HODGE, J.                                                                                           July 29, 2025

## MEMORANDUM

On February 12, 2021, Plaintiff Shawn T. Walker ("Plaintiff") filed a Complaint against Pamela Sellers, Mr. J. Peters,[1] Gina Clark, Derek White, Ryan Szelewski, Joseph Terra, Jeffrey Baker, Dr. Brian Schneider, Tammy Ferguson, and Zachary J. Moslak alleging that Defendants violated his First Amendment rights. (ECF No. 2.)[2] On June 8, 2023, all Defendants filed a Motion to Dismiss for failure to state a claim. (ECF No. 33.) On March 5, 2024, the late Judge Gene E.K. Pratter granted in part and denied in part the motion to dismiss, leaving only Sellers and Peters (collectively, "Defendants") as Defendants in the case (ECF No. 37.)[3]

Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 48.) Plaintiff opposes the Motion. (ECF No. 52.) For the reasons set forth below, Defendants' Motion is denied.

---

[1]　　The briefing provides no explanation for why Defendant J. Peters is identified using only an initial rather than his full name. However, Exhibit 6 to the Motion for Summary Judgment identifies him as Sergeant John Peters III in the heading of his declaration. (*See* ECF No. 48-6 at 1.)
[2]　　The Court adopts the pagination supplied by the CM/ECF docketing system.
[3]　　As a result, this Court will only consider retaliation claims against Sellers and Peters.

I.      FACTUAL BACKGROUND

Plaintiff Shawn T. Walker brings First Amendment retaliation claims against Defendants Sellers and Peters. (ECF No. 48 at 3.) Plaintiff is currently incarcerated at State Correctional Institution ("SCI")-Phoenix Maximum Security Prison, where he is serving a life sentence. (ECF No. 52 at 3.).

In December 2013, Plaintiff filed a 42 U.S.C. § 1983 Civil Rights Complaint naming Sellers as a defendant.[4] (ECF No. 52 at 2.) Plaintiff alleges no further interaction with Sellers or related conduct until several years later. (ECF No. 52 at 2.) Prior to his current incarceration at SCI-Phoenix, Plaintiff was being held at SCI-Graterford. (ECF No. 48 at 1.) On July 15, 2018, Plaintiff was transferred from SCI-Graterford to SCI-Phoenix and assigned to live on J-Block. (ECF No. 48 at 1.) Defendant Sellers served as the Unit Manager of J-Block at SCI-Phoenix and Plaintiff's transfer to J-Block was the first contact Plaintiff had with Sellers since Plaintiff filed the 2013 lawsuit. (ECF No. 52 at 3.) At SCI Phoenix, Plaintiff was assigned to a single unit cell directly across from Sellers' office. (ECF No. 52 at 3.)

During Plaintiff's transfer from SCI-Graterford to SCI-Phoenix, some of his property was damaged or lost. (ECF No. 48 at 1.) Plaintiff signed a settlement agreement with the prison to receive compensation for his lost and damaged property. (ECF No. 48 at 1.) According to Plaintiff, he never received the money from the settlement agreement. (ECF No. 52 at 3.) Plaintiff then asked Sellers to investigate the matter and help Plaintiff get his money, to which, according to Plaintiff, Sellers refused to do. (ECF No. 52 at 3.) On October 25, 2018, Plaintiff submitted a DC-

---

[4]     The record does not include a copy of the 2013 complaint, and the specific claims asserted against Sellers in that action are not available to this Court. (ECF No. 2 at 3; ECF No. 48 at 6.)

2

135A[5] request form to then-Superintendent Tammy Ferguson inquiring about the settlement funds and complaining that Sellers was "no help." (ECF No. 48 at 1-2.) According to Plaintiff, on October 31, 2018, Sellers approached Plaintiff and asked him to sign a new settlement agreement.[6] (ECF No. 52 at 3.) During their exchange, Sellers asked Plaintiff why he told people she was "no help" and threatened to stab Plaintiff in the eye with her pen.[7] (ECF No. 52 at 3-4.) Sellers also demanded an apology from Plaintiff and threatened multiple times to move Plaintiff to a new housing unit where someone would be of more help to him, to which Plaintiff said he was okay to stay in J-block and wanted to be left alone. (ECF No. 52 at 4.)

On November 1, 2018, Plaintiff submitted another DC-135A request form to then-Superintendent Tammy Ferguson, in which he thanked her for "straightening the problem out" with his settlement agreement, but complained Sellers was "acting really crazy" towards Plaintiff. (ECF No. 48 at 2.) According to Plaintiff, the request specifically informed Ferguson that he was receiving threats from Sellers because he complained about her and filed a lawsuit against her. (ECF No. 52 at 4.) Defendant Ferguson referred the matter to the security office to investigate. (ECF No. 52 at 4.)

According to Plaintiff, on December 13, 2018, Sellers moved Plaintiff out of his cell to a different and reportedly dirty cell on the top tier. (ECF No. 52 at 4.) Plaintiff sent then-Superintendent Tammy Ferguson another DC-135A request form informing her of what he believed to be a retaliatory move to a new cell. (ECF No. 52 at 4-5.) Defendant Ferguson again

---

[5] A DC-135A is an internal Department of Corrections form titled "Inmate's Request to Staff Member," used by incarcerated individuals to communicate directly with prison staff. (*See* ECF No. 48-1 at 1.)

[6] The record does not include a copy of the proposed settlement agreements, nor does it disclose why a new settlement agreement was offered. Plaintiff's pleadings provide no further detail beyond his account of the interaction that occurred when the new agreement was presented. (ECF No. 52 at 3-4.)

[7] Although this interaction occurred outside the applicable limitations period, it may still be considered as background evidence to support Plaintiff's claim of retaliation by establishing a pattern of antagonism. *See Witbeck v. Equip. Transp., LLC*, 2022 WL 625719, at *5 (M.D. Pa. Mar. 3, 2022) (finding that "past discriminatory conduct direct at the plaintiff outside of the statutory period can constitute background circumstantial evidence.").

referred the matter to the security office to investigate. (ECF No. 52 at 5.) On December 17, 2018, Sellers was interviewed by Security Lieutenant Mr. Everding[8] to investigate the move. (ECF No. 52 at 5.) After the interview, Sellers told other inmates that Plaintiff complained about her and was trying to get her kicked off the housing unit. (ECF No. 52 at 5.) When Plaintiff heard that Sellers was sharing his complaints with other inmates, he sent Ferguson another DC-135A request form, his 4th, to report the conduct. (ECF No. 52 at 5.) Defendant Ferguson once again referred the matter to the security office to investigate. (ECF No. 52 at 5.) Plaintiff alleges that his cell had no electricity, so he sent another DC-135A request form regarding this matter. (ECF No. 52 at 5.) As of December 2018, Plaintiff had submitted five DC-135A requests concerning Sellers and questioning his cell transfer. (ECF No. 52 at 3-5.)

Between December 2018 and March 2019, Plaintiff alleges that, during a walk to a meal, Unit Manager Gerald Kelly informed him that Sellers was mad because of the complaints, wanted Plaintiff off her housing unit and was trying to find a place for Plaintiff to move. (ECF No. 52 at 6.) Plaintiff informed Kelly that he did not want to move. (ECF No. 52 at 6.) On March 12, 2019, Plaintiff was informed by another inmate that he was scheduled to be transferred from J-block to F-block that evening. (ECF No. 48 at 2.) Following this notification, Plaintiff and Defendants have differing reports as to what took place.

According to Defendants, Plaintiff allegedly went to Sellers' office and told her that he "wasn't moving to F-block." (ECF No. 48 at 2.) Sellers then told Peters that Plaintiff was "refusing to move to F-block". (ECF No. 48 at 2.) Later that evening, Peters arrived at Plaintiff's cell to transfer him to F-block, but Plaintiff refused Peters' order and stated, "I'm not moving take me to the RHU." (ECF No. 48 at 2.) Plaintiff was then placed in disciplinary custody and issued a

---

[8] The record does not include Security Lieutenant Mr. Everding's first name. (ECF No. 52 at 5.)

4

misconduct report by Peters in accordance with DC-ADM 801[9] for refusing to obey an order. (ECF No. 48 at 2.)

According to Plaintiff, he went to Sellers' office and asked, "if she was moving him to F Unit at 6PM, she said yes, and told Plaintiff 'if he had a problem with it to file a lawsuit since you like suing people.'" (ECF No. 52 at 6.) Plaintiff then told Sellers that he didn't want to move and wanted to talk to Ferguson to stop the move. (ECF No. 52 at 6.) Before Plaintiff could talk to Ferguson, however, Sellers had called a security team to place Plaintiff in punitive segregation.[10] (ECF No. 52 at 6.) Plaintiff alleges that he did not resist or threaten the staff in any way during the transfer. (ECF No. 52 at 6.) Plaintiff also alleges that Sellers had Peters falsify a DC-141[11] misconduct report with an incident time of "15:30" on it, even though his time to move would not occur until 6:00 PM. (ECF No. 52 at 7.)

On the day of the transfer, Plaintiff filed Grievance #791655, alleging his transfer to F-block was retaliation by Sellers for the complaints he made against her. (ECF No. 48 at 2.) Grievance #791655 did not request monetary damages but instead requested a complete and thorough investigation into Sellers' conduct. (ECF No. 48-7 at 1.) On March 15, 2019, a hearing on the misconduct report found Plaintiff guilty of disobeying an order to move cells, and punishing him with 15 days of disciplinary custody. (ECF No. 48 at 3.) Plaintiff appealed the decision. (ECF

---

[9] DC-ADM 801 is the Pennsylvania Department of Corrections Inmate Discipline Administrative Policy. According to the Commonwealth of Pennsylvania's official website, "this policy establishes a disciplinary process that provides clear notice of prohibited behavior, outlines a fundamentally fair hearing process and establishes consistent sanctions for violations of Department rules and regulations." *See* Understanding DOC Administrative Policies, available online at: https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/Understanding-DOC-Administrative-Policies.pdf (last updated October 2022) (last visited July 8, 2025); *see also Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 259 (E.D. Pa. 2020) ("Information found on government websites is widely considered both self-authenticating and subject to judicial notice.").
[10] Punitive segregation is not defined explicitly by the Pennsylvania Department of Corrections. However, punitive segregation can generally be defined as a form of restricted housing used as a disciplinary sanction for violation of department rules.
[11] A DC-141 is a Department of Corrections "Misconduct Report" form used by prison staff to document and notify inmates of alleged disciplinary violations. (*See* ECF No. 48-5 at 1.)

No. 48 at 3.) On March 22, 2019, Plaintiff filed an additional grievance (#793255) reiterating the retaliatory claims against Sellers, which also did not request monetary damages. (ECF No. 48 at 3.) On March 25, 2019, Plaintiff's misconduct appeal was denied by the Program Review Committee. (ECF No. 48 at 3.) Plaintiff appealed the decision, which was denied on April 2, 2019 by then-Superintendent Ferguson. (ECF No. 48 at 3.) Plaintiff finally appealed Ferguson's decision, which was denied on April 25, 2019 by the Chief Hearing Examiner, the final level of administrative review.[12] (ECF No. 48 at 3.)

## II.   LEGAL STANDARD

A motion for summary judgment must be denied unless the moving party is able to show "no genuine dispute as to any material fact" and that the "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility" of identifying the portions of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute is defined as one in which a jury could reasonably find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). In assessing materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

When the defendant moves for summary judgment, "the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to her case." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The summary judgment standard

---

[12] Defined by the Pennsylvania Department of Corrections as "an employee of the Department's Office of Chief Counsel who conducts final reviews of inmate misconduct appeals." *See* 801 Policy, available online at: https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/801-inmate-discipline.pdf (effective January 22, 2024) (last visited July 8, 2025).

requires the court to view the evidence in the light most favorable to the non-moving party, including all justifiable inferences. *Anderson,* 447 U.S. at 255. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 248. If the court finds that any factual issues exist that could be reasonably resolved for either party, and thus requires the presence of a fact finder, then summary judgment must be denied. *Id.* at 250.

### III.    DISCUSSION

#### A. Failure to Exhaust

Before evaluating the retaliation claim, the Court must address Defendants' argument that Plaintiff failed to exhaust his administrative remedies. The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust available administrative remedies before bringing a 42 U.S.C. § 1983 claim objecting to the conditions of confinement in federal court. *Washington v. Gilmore*, 852 F. App'x 639, 641 (3d Cir. 2021). The requirement to exhaust available administrative remedies generally applies to all claims arising out of prison life, except those that implicate the duration of the prisoner's sentence. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To exhaust administrative remedies within the Pennsylvania prison system, an inmate must complete all three stages of the grievance and appeals process.[13] *Dickson v. Ennis*, 2021 WL 2322403, at *4 (W.D.Pa. Jun. 7, 2021). In addition, "an inmate who desires compensation or other legal relief normally available from a court must request the relief with specificity in his/her initial grievance."

---

[13]   To satisfy the three-step grievance and appeals process, the inmate must first "legibly set forth all facts and identify all persons relevant to his claim in a grievance which will then be subject to initial review," then "the initial review must be appealed to the Facility Administrator for a second level of review" and, finally, "the inmate is required to file an appeal to the Secretary's Office of Inmate Grievances and Appeals (the Secretary's Office)." *Dickson v. Ennis*, 2021 WL 2322403, at *4 (W.D.Pa. Jun. 7, 2021) (citing *Smith v. Sec. of Pa. Dep't of Corr.*, 2018 WL 279363, at *2 (W.D. Pa. Jan. 3, 2018).

*Id.* Only after completing the three-step grievance process and specifically requesting the desired relief are administrative remedies considered properly exhausted. *Id.*

Defendants argue that Plaintiff failed to properly exhaust his administrative remedies under the PLRA because he did not request monetary relief in either of the two grievances he submitted concerning the March 2019 incident. (ECF No. 48 at 4.) According to Defendants, this failure to request monetary damages precludes him from seeking monetary relief in this lawsuit. (ECF No. 48 at 5.)

Failure to request monetary damages in an inmate grievance may, in some cases, preclude the Plaintiff from seeking that relief in a subsequent lawsuit. *See Dickson*, 2021 WL 2322403 at *5 (holding that plaintiff failed to exhaust administrative remedies by requesting compensatory damages in his lawsuit but failing to request such relief in either of his grievances). However, even though Plaintiff does not seek monetary relief in this case, the Court does not need to determine whether his grievances were adequate to preserve such a claim. (ECF No. 2 at 11.) Specifically, in the "Relief Requested" section of his complaint, Plaintiff asks the court to enter a declaratory judgment that Defendants "[retaliated] against Plaintiff for exercising his rights to file complaints, [thereby violating] Plaintiff's rights under the First Amendment to the United States Constitution." (ECF No. 2 at 11.) There is no mention of a request for damages and nothing in the Plaintiff's opposition or accompanying filings indicating an intention to pursue monetary relief. (*See* ECF No. 2 at 11; ECF No. 52 at 9.) Thus, Plaintiff's claim in this case is properly construed as seeking declaratory relief only.

Any argument that Plaintiff failed to exhaust his request for declaratory relief during the grievance process is unconvincing to the Court. Implicit in the grievance is a request for a determination that Defendants engaged in wrongdoing, specifically that they retaliated against

Plaintiff. That is precisely the resolution Plaintiff now seeks through his request for a declaratory judgment in this case. Although the term "declaratory judgment" does not appear in the grievance itself, the relief sought is the same. Accordingly, the Court proceeds to evaluate the merits of the Plaintiff's First Amendment retaliation claim against Defendant Sellers and Peters, solely for the purposes of determining whether declaratory relief is warranted.

### B. Retaliation

To succeed on a First Amendment retaliation claim under § 1983, a plaintiff must establish three elements: "(1) constitutionally protected conduct, (2) an adverse action by prison officials 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'" *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir.2001)). Once the plaintiff establishes the elements of a retaliation claim, the burden shifts to the defendant to prove "they would have taken the same disciplinary action even in the absence of the protected activity." *Rauser*, 241 F.3d at 333.

    *i.    Protected Activity*

To establish the first element of a retaliation claim, "a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected." *Rauser*, 241 F.3d at 333. Plaintiff's use of the inmate request system (DC-135A) to file grievances against prison officials qualifies as constitutionally protected activity. The Third Circuit has repeatedly affirmed that a prisoner's right to file grievances is protected by the First Amendment. *See Mitchell*, 318 F.3d 523 at 530 (holding that the filing of prison grievances "implicates conduct protected by the First Amendment"); *see also Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000) (recognizing that a prisoner states a viable retaliation claim by alleging he was placed in

9

administrative segregation as a punishment for filing civil rights complaints). Defendants do not contest that Plaintiff engaged in protected conduct, and the record contains no indication that this element is in dispute. Thus, the first prong of the retaliation analysis is satisfied.

  *ii.*  *Adverse Action*

To establish the second element of a retaliation claim, a prisoner-plaintiff must show that he suffered an adverse action by prison officials. *Rauser*, 241 F.3d at 333. A plaintiff can satisfy this element by demonstrating that the action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Allah*, 229 F.3d at 225 (internal citations omitted). Here, Plaintiff alleges that he suffered two adverse actions: (1) the transfer from J-Block to F-Block and (2) the transfer to punitive segregation. (ECF No. 52 at 10.)

As to the transfer from J-Block to F-Block, the Court concludes that this alone is not sufficient to qualify as an adverse action. In his deposition, Plaintiff acknowledged that "there's really no difference" between the two units, stating that "they're both general population units." (ECF No. 48-13 at 11.) Courts in this Circuit have held that a transfer between equivalent housing units does not amount to an adverse action for the purposes of a retaliation claim. *See Keeling v. Barrager*, 2014 WL 1338077, at *10 (M.D. Pa. Apr. 3, 2014) ("The transfer of an inmate from one cellblock to another is insufficient to deter a person of ordinary firmness from exercising his constitutional rights."), *aff'd*, 666 F. App'x 153 (3d Cir. 2016); *see also Roman v County of Chester*, 2024 WL 4844792, at *12 (E.D. Pa. Nov. 20, 2024) (recognizing that certain cell changes, such as transfers to administrative segregation, restricted housing, or less desirable units, may constitute adverse actions, while transfers that involve only temporary inconvenience generally do not).

Plaintiff nonetheless argues that the lack of any meaningful difference between the units suggests that the transfer was purposeless and therefore retaliatory. (ECF No. 52 at 10.) However,

10

at this stage of the analysis, the question is not the prison official's motive or rationale, but rather whether the action itself was sufficiently unfavorable to deter a person of ordinary firmness from exercising their rights. *Allah*, 229 F.3d at 225. Because Plaintiff has not shown that the transfer from J-Block to F-Block involved harsher conditions or meaningful deprivation, it alone does not qualify as an adverse action.

However, the second alleged adverse action, Plaintiff's placement in punitive segregation, does constitute an adverse action for the purposes of a First Amendment retaliation claim. The Third Circuit has recognized that placement in punitive segregation may deter a person of ordinary firmness from exercising constitutional rights, depending on the conditions and context. *Allah*, 229 F.3d at 225. In *Allah v. Seiverling*, the court emphasized that this determination is fact-specific and may turn on whether the segregation involved significant deprivations, such as limited phone access, reduced recreation, or lack of legal materials. *Id.* Whether such conditions rise to the level of adverse action is a question best left to a factfinder. *Id.*

In addition, courts have recognized that the issuance of false misconduct reports may also constitute an adverse action. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). Plaintiff alleges that Defendants fabricated misconduct charges in retaliation for his protected activity, raising a material dispute of fact. (ECF No. 52 at 7.) While the record here does not detail the precise conditions of Plaintiff's confinement, the use of punitive segregation coupled with the allegation that the misconduct report was fabricated is sufficient to create a genuine dispute of material fact as to whether there was an adverse action. Taken together, these allegations preclude summary judgment on the adverse action prong.

      *iii.*        *Causal Connection*

To satisfy the third element of a retaliation claim, a plaintiff must show that his constitutionally protected conduct was a "substantial or motivating factor" in the adverse action taken against him. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir.2001). To establish a causal connection, a plaintiff can either prove: 1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or 2) a pattern of antagonism coupled with timing to establish a causal link. *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). Where the temporal proximity is not "unduly suggestive," a plaintiff can succeed by proving "timing plus other evidence." *Id.* Once the plaintiff proves a causal connection, the burden shifts to the defendant to prove "by a preponderance of the evidence that it would have taken the same disciplinary action even in the absence of the protected activity," also called the "same decision defense." *Rauser*, 241 F.3d at 333.

Here, Plaintiff has produced sufficient evidence that his act of filing grievances was a substantial and motivating factor in his transfer to punitive segregation. With respect to the timing, Plaintiff submitted five DC-135A grievances between October and December 2018, four of which alleged harassment by Defendants. On the day of his transfer, Plaintiff alleges that he went to Sellers' office and asked, "if she was moving him to F Unit at 6PM." (ECF No. 52 at 6.) Sellers confirmed the move and allegedly told Plaintiff, "if he had a problem with it to file a lawsuit since you like suing people." (ECF No. 52 at 6.) Plaintiff responded that he didn't want to move and wanted to talk to Ferguson to stop the move. (ECF No. 52 at 6.) Before he could do so, a security team was called to place him in punitive segregation (ECF No. 52 at 6.)

Plaintiff's account indicates that he attempted to invoke his constitutional rights immediately before the disciplinary action occurred, supporting a strong inference of temporal

proximity. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (noting that a two-day gap between protected activity and retaliation may, by itself, establish causation). In addition, he alleges that Sellers made repeated threats in response to his prior grievances. (ECF No. 52 at 3-4.)

Courts have also recognized that a broader pattern of antagonism may be relevant to an inference of causation, even where some of the antagonistic conduct falls outside the statute of limitations. *See Witbeck v. Equip. Transp., LLC*, 2022 WL 625719, at *5 (M.D. Pa. Mar. 3, 2022) (finding that a defendant's history of mistreatment towards plaintiff was probative of a pattern of discrimination, even though the events of mistreatment predated the statutory period). Here, the relationship between Plaintiff and Sellers has been contentious for years, beginning with a prior 2013 lawsuit filed by Plaintiff against Sellers and continuing through repeated threats and hostile interactions after Plaintiff's transfer to Sellers' cellblock. (ECF No. 52 at 2-4.) Specifically, Plaintiff alleges that Sellers threatened to stab Plaintiff in the eye with her pen for telling others that she was "no help". (ECF No. 52 at 3-4.) This combination of closely timed events and a pattern of antagonistic behavior is sufficient at this stage to support a causal connection between Plaintiff's protected conduct and the adverse action.

Since Plaintiff has produced sufficient evidence to support a causal connection between his constitutionally protected conduct and his placement in punitive segregation, the burden shifts to the Defendants to demonstrate that they would have taken the same action in the absence of plaintiff's grievances. The "same decision defense" requires Defendants to show that the misconduct charge and subsequent placement in punitive segregation were reasonably related to a legitimate penological interest. *Rauser*, 241 F.3d at 334.

Here, Defendants claim that Plaintiff was sent to punitive segregation solely because he refused the order to move to F-Block. (ECF No. 48 at 2.) Defendants' position relies on the assertion that Plaintiff outwardly disobeyed Peters' order by saying "I'm not moving take me to the RHU." (ECF No. 48 at 2.) However, Plaintiff expressly denies making that statement and maintains that he did not in any way refuse the transfer. (ECF No. 52 at 6.) These accounts are fundamentally contradictory, presenting a genuine dispute of material fact.

In reviewing a motion for summary judgment, the Court must "view the evidence and all justifiable inferences to be drawn therefrom in the light most favorable to the non-moving party." *Watson*, 834 F.3d at 424 (quoting *Rauser*, 241 F.3d at 334). At this stage, it is not the Court's role to determine whether Plaintiff's account is credible or whether the misconduct report was appropriately given. Because the Court must view evidence in the light most favorable to Plaintiff, Plaintiff has provided enough evidence to link his protected conduct to the adverse action. The Court is not in the position of choosing between the credibility of the Plaintiff or the Defendant. That is a job solely for a finder of fact. Because the credibility of both accounts hinges on factual determinations, the issue of causation cannot be resolved as a matter of law.

## IV.　CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied in its entirety. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**
_____
**　　HODGE, KELLEY B., J.**